OPINION OF THE COURT
Per Curiam.
Order, dated April 6, 2005, affirmed.
Adopting the reasoning applied by the suppression court, we agree that the police lacked a sufficient basis to suspect that defendant was armed, so as to justify the forcible stop of the livery cab and ensuing frisk of the defendant. Absent here was “ ‘proof of a describable object or of describable conduct that provides a reasonable basis for the police officer’s belief that the defendant had a gun in his possession’ ” (People v Ventura, 139 AD2d 196, 208 [1988], quoting People v Prochilo, 41 NY2d 759, 761 [1977]). It is significant to note that, on cross-examination by defense counsel, the testifying police officer (Baumeister) acknowledged that he was far from certain what the shapeless bulge in defendant’s pants leg represented, and that he and his partner stopped the livery cab to “further investigate]” defendant.* Despite his acknowledged uncertainty, the testifying officer nonetheless stated his belief that the bulge might be some form of weapon, a belief ostensibly based upon the officer’s unparticularized “training and experience.” The following exchange on cross-examination makes clear that the officer had no more than a hunch that defendant was armed.
“Q: Now, you described, again before he got into the taxi, you described a bulge below the left pocket, correct, on the left leg?
“A: Yes, in the area of his knee.
“Q: You didn’t know what that bulge was, correct?
“A: I believed it to be, from my training and experience with past arrests, to be a weapon.
*46 “Q: But you didn’t know what it was?
“A: No, I didn’t know at the time.”
As the motion court aptly recognized, the police actions in allowing a parked livery cab containing a passenger thought to be carrying a concealed weapon to pull away in the first instance and in later approaching the stopped vehicle without calling for assistance or drawing their guns was “consistent with [the testifying officer’s] testimony that he did not know what the bulge was,” and, as case law establishes, belied their claimed suspicion of defendant being armed (see People v Marine, 142 AD2d 368, 371 [1989]; People v Miller, 121 AD2d 335, 337 [1986], lv denied 68 NY2d 815 [1986]). Moreover, the officer’s tentative belief that the bulge might be a weapon was “absolute speculation, since [he] never observed any part of or the shape of a [gun] and had no independent information that men with guns were in the vicinity” (People v Ventura, 139 AD2d at 207).
Nor did the idiosyncratic limp displayed by defendant during the 20-second period that Officer Baumeister estimated it took defendant to walk from the apartment building to the livery cab trigger a founded or reasonable suspicion that he was armed. Given the officer’s lack of prior knowledge of, or prior dealings with, defendant that might provide a basis for ascribing criminality to his gait, the defendant’s unusual way of walking was clearly susceptible of an innocent explanation and was too equivocal to provide reasonable suspicion that he was carrying a gun (cf. People v Soto, 266 AD2d 74 [1999], lv denied 94 NY2d 925 [2000] [defendant observed walking with a suspicious gait, clutching an object in his waistband and, together with three other men, “acting in a manner which raised the officer’s suspicion that they were ‘casing’ a bar for a robbery”]). Further, it was both innocuous and unsurprising for defendant and his companion — walking in a “fairly high crime area” at around 2:00 a.m. — to have changed direction, seemingly to avoid two (then) unidentified plainclothes police officers who were watching them from an unmarked patrol car. A consideration of the facts in their totality, particularly the amorphous nature of the bulge and the testifying officer’s candid concession that the vehicle was stopped to allow for further investigation, leads us to conclude that the stop was not based on the requisite reasonable suspicion (see People v Spencer, 84 NY2d 749, 752-755 [1995], cert denied 516 US 905 [1995]; People v Taylor, 31 AD3d 1141, 1142 [2006]).
A response to the dissent is warranted. Even assuming that Officer Baumeister’s scant and equivocal suppression testimony *47 can be read to reflect his belief — reasonable or otherwise — that the bulge in defendant’s pants leg was a weapon and, further, a weapon longer than a typical handgun, it is a quantum leap to conclude that such a belief would somehow serve to mollify the officers’ safety concerns in approaching the stopped livery cab, or explain their conduct in approaching the vehicle without drawing their service revolvers or taking other appropriate safety precautions. The suppression record provides no satisfactory explanation for why the officers would have kept their weapons bolstered — late at night in a high-crime area — while approaching an automobile passenger whom they seriously believed to be armed, an encounter which necessarily would be fraught with “inherent and inordinate danger” to the officers (People v Robinson, 74 NY2d 773, 774 [1989], cert denied 493 US 966 [1989]; see Pennsylvania v Mimms, 434 US 106, 110 [1977]; see also People v Torres, 74 NY2d 224, 236 [1989, Bellacosa, J., dissenting] [recognizing “police procedure of approaching vehicles with drawn weapons ... in the dangerous setting of cases” involving the suspected presence of guns]). With due respect, the explanation proffered by the dissenter — that the officers had little reason to believe that defendant could “quickly” draw a weapon, in view of “the length and location of the shotgun” ultimately found and the defendant’s “seated position” (dissenting op at 49, 50) — relies on facts not then known to the police and, moreover, is contrary to experience and logic. Finally, we need to emphasize that the officers’ conduct in approaching the stopped livery cab without drawing their weapons bears not on their use of proper judgment or “professionalism]” (dissenting op at 50), but instead serves as a strong objective indicator that, at the time of the vehicle stop, the police had not yet formed the belief that defendant was armed. Despite the dissenter’s strained attempt to explain the officers’ conduct, we remain unconvinced that this anticrime team would have approached the stopped vehicle without pulling their guns in the dangerous and indeed life-threatening situation portrayed by the testifying officer’s rendition of the facts.

 The suppression record contains no indication whatsoever that the police questioned defendant or otherwise conducted a further investigation upon stopping the livery cab. This deficit in proof is attributable to the People’s unexplained failure to call as a witness the officer (Fiorillo) who ordered defendant out of the cab and frisked him.